UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

**FILED**

AUG 1 2 2016


CLERK

| | |
|---|---|
| DEBRA GRIFFITH,<br><br>        Plaintiff,<br><br>    vs.<br><br>CITY OF WATERTOWN,<br><br>        Defendant. | 1:15-CV-01020-RAL<br><br>OPINION AND ORDER GRANTING<br>DEFENDANT'S MOTION FOR SUMMARY<br>JUDGMENT |

Debra Griffith ("Griffith") sued her former employer, the City of Watertown ("the City"), alleging claims of hostile work environment, gender discrimination, retaliation, intentional infliction of emotional distress, and negligent infliction of emotional distress. Doc. 1 at 7–9. Griffith seeks monetary relief, including compensatory damages, attorney's fees, and punitive damages. Doc. 1 at 9–10. The City moved for summary judgment on all claims, Doc. 18, which Griffith opposes, Doc. 27. For the reasons explained below, the City's motion for summary judgment is granted.

**I. SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (stating that a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and a fact is "material" where it would affect the outcome of the case). Rule 56 places the burden initially on

the moving party to clearly establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012). "A party opposing summary judgment may not rest upon mere allegations or denials contained in the pleadings, but must, by sworn affidavits and other evidence, set forth specific facts showing that there is a genuine issue for trial." Mehrkens v. Blank, 556 F.3d 865, 868–69 (8th Cir. 2009); see also Mosley v. City of Northwoods, Mo., 415 F.3d 908, 910 (8th Cir. 2005). "If 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party, as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Reed v. City of St. Charles, 561 F.3d 788, 790 (8th Cir. 2009)). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal quotation marks omitted) (quoting Celotex Corp., 477 U.S. at 327).

## II. PRELIMINARY ISSUE

The City moved for summary judgment on all of Griffith's claims and on her request for punitive damages. Doc. 18. Griffith's brief in response to the City's motion, however, only

2

directly addresses the gender discrimination claim. Doc. 27. The City contends that due to Griffith's limited response, Griffith has waived all other causes of action. Doc. 33 at 1 (citing Satcher v. Univ. of Ark. at Pine Bluff Bd. Tr., 558 F.3d 731, 734–35 (8th Cir. 2009) ("[F]ailure [of the nonmoving party to] oppose a basis for summary judgment constitutes a waiver of that argument.")). Although it is not this Court's "responsibility to sift through the record to see if, perhaps, there [is] an issue of fact," Satcher, 558 F.3d at 735, Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); see also Fed. R. Civ. P. 56(e) (providing that if a party "fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed . . . [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it"). Thus, this Court will address the arguments Griffith failed to defend in her brief. See also South Dakota v. U.S. DOI, 775 F. Supp. 2d 1129, 1133 n.1 (D.S.D. 2011) (addressing all arguments despite non-movant's failure to respond to all of movant's arguments and non-movant's waiver of challenges at oral argument).

## III. FACTS[1]

Griffith was hired by the City as a police officer for the Watertown Police Department ("the Department") in January 2007. Doc. 23 at ¶ 1; Doc. 28 at ¶ 1. Griffith married Tylor

---

[1] Local Rule 56.1(D) of the Civil Local Rules of Practice of the United States District Court for the District of South Dakota states that all material facts set forth by the moving party are deemed admitted "unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1(D). Thus, a vast majority of the facts are derived from the City's statement of undisputed facts, Doc. 23, because Griffith only partially objected or objected to seven out of the City's sixty-two statements of undisputed facts, see Doc. 28.

3

Griffith ("Tylor"), a coworker and fellow police officer, in September 2009.[2]  Doc. 23 at ¶ 3;

Doc. 28 at ¶ 3.  Griffith and Tylor have one special-needs child, who was born in March 2012.

Doc. 22-3 at 25; Doc. 30-7 at 2.

In early January 2011, Griffith spoke with Communications Officer Leslie Rau ("Rau")

about how she and Tylor had recently argued at a police Christmas party.  Doc. 22-3 at 9–10;

Doc. 30-5 at ¶ 16.  Griffith told Rau that Tylor accidentally slammed a door on her hand.  Doc.

22-3 at 10.  Rau reported the conversation she had with Griffith to Captain Tracy Schaefer,

noting that Griffith had a "mark above her eye" or "very slight swelling."  Doc. 30-5 at ¶ 16;

Doc. 30-6 at 1; Doc. 30-7 at 2.

As a result of Rau's report, the South Dakota Division of Criminal Investigation ("DCI")

investigated a possible domestic assault by Tylor on Griffith.  Doc. 22-3 at 10; Doc. 23 at ¶ 5

(first paragraph 5); Doc. 28 at ¶ 5.  During the investigation, Griffith told the DCI investigator

that Tylor never hit or pushed her and that the injury she received to her hand was accidental.

Doc. 23 at ¶ 6; Doc. 28 at ¶ 6.  The City also investigated the January 2011 incident and Griffith

similarly told the City that Tylor never hit her or pushed her and that her hand injury was an

accident.  Doc. 23 at ¶ 7; Doc. 28 at ¶ 7.  Neither Griffith nor Tylor was criminally charged for

the January 2011 incident, but both were reprimanded by the City for public intoxication.  Doc.

23 at ¶ 8; Doc. 28 at ¶ 8.  Following the reprimand, Griffith had a counseling session with the

female chief of police, during which she denied being a victim of domestic violence.  Doc. 23 at

¶ 9; Doc. 28 at ¶ 9.

Later, in October 2012, Griffith called 911 to report that Tylor was banging his head and

slamming doors.  Doc. 22-3 at 12; Doc. 23 at ¶ 10; Doc. 28 at ¶ 10.  Assistant Chief of Police

---

[2] Tylor never served as Griffith's supervisor during her employment.  Doc. 23 at ¶ 4; Doc. 28 at
¶ 4.

4

Lee McPeek[3] ("McPeek") called to check on Griffith. Doc. 23 at ¶ 14; Doc. 28 at ¶ 14; Doc. 30-1 at 2. Griffith told McPeek that she was okay. Doc. 22-3 at 13; Doc. 23 at ¶ 14; Doc. 28 at ¶ 14; Doc. 30-7 at 4. McPeek later questioned Tylor about the incident. Doc. 23 at ¶ 15; Doc. 28 at ¶ 15. McPeek testified that Tylor said he was just frustrated, that he could not do anything right in Griffith's eyes, and that he just hit his head on the door frame. Doc. 22-4 at 2. Shortly thereafter, Griffith and Tylor separated and eventually divorced in November of 2013. Doc. 23 at ¶ 16; Doc. 28 at ¶ 16; Doc. 34-1 at 6–7. Griffith did not tell the responding officers that Tylor had assaulted her or that she feared for her safety, nor did she tell anyone on the ambulance crew that she was threatened or harmed by Tylor. Doc. 23 at ¶¶ 11–13; Doc. 28 at ¶¶ 11–13.

After the October 2012 incident, Griffith declined McPeek's offer to change Griffith's and Tylor's shifts. Doc. 22-3 at 14; Doc. 23 at ¶ 17; Doc. 28 at ¶ 17. Approximately two weeks later, however, the City made the decision to separate Griffith and Tylor's shifts in an effort to pre-emptively avert any future issues that could arise between the divorcing couple. Doc. 22-4 at 4; Doc. 23 at ¶¶ 18–19; Doc. 28 at ¶¶ 18–19. Tylor's shift was changed, and the City informed him that he and Griffith could not work together on future shifts. Doc. 22-4 at 3–4; Doc. 23 at ¶ 18; Doc. 28 at ¶ 18.

As part of her employment, Griffith received domestic violence training at the police academy, and an additional twenty-eight hours of training on domestic violence and sexual assault was provided by the City. Doc. 22-3 at 3, 7; Doc. 23 at ¶ 24; Doc. 28 at ¶ 24. Around March of 2013, she was assigned to the domestic violence unit at the Department where she focused on investigating domestic violence issues. Doc. 22-3 at 8; Doc. 23 at ¶ 25; Doc. 28 at ¶ 25.

---

[3] McPeek later became the Chief of Police in April of 2013. Doc. 22-4 at 8; Doc. 23 at ¶ 14 n.2; Doc. 28 at ¶ 14.

5

Griffith acknowledged that she failed to timely report that she was a victim of any domestic assault or abuse. Doc. 22-3 at 6; Doc. 23 at ¶ 22; Doc. 28 at ¶ 22. Griffith testified that she failed to utilize the City's anti-harassment policies, the Department's anti-harassment and sexual misconduct policies, and the employee assistance program. Doc. 22-3 at 3, 5, 14; Doc. 23 at ¶ 23; Doc. 28 at ¶ 23. Griffith did not seek help from anyone at the Department regarding domestic violence counseling or training for her or Tylor. Doc. 22-3 at 14; Doc. 23 at ¶ 23; Doc. 28 at ¶ 23.

On July 8, 2013, Griffith met with the new Assistant Chief Tim Toomey ("Toomey") and told him that she lied during the investigation of the January 2011 incident; she claimed that Tylor had physically abused her that evening. Doc. 22-3 at 16; Doc. 23 at ¶ 20; Doc. 28 at ¶ 20. For the first time, Griffith informed the City that Tylor had been harassing or stalking her at work. Doc. 22-3 at 16; Doc. 23 at ¶ 21; Doc. 28 at ¶ 21. Toomey asked Griffith to write out a statement regarding the history of abuse and advised her that the DCI would investigate the matter. Doc. 22-3 at 16–17; Doc. 23 at ¶¶ 26–27; Doc. 28 at ¶¶ 26–27. By mutual agreement, Griffith was sent home for the day. Doc. 22-3 at 16–17. Toomey asked Griffith to call him at a specific time and at a specific number twice a day to check in and confirm that she was safe. Doc. 22-3 at 17; Doc. 23 at ¶ 28; Doc. 28 at ¶ 28.

Griffith testified that she returned to the Department on July 10, 2013, provided her written statement to Toomey and McPeek, and was placed on administrative leave with pay. Doc. 22-3 at 17–18; Doc. 23 at ¶ 28; Doc. 28 at ¶ 28. She agreed that going on paid leave was probably the best course of action. Doc. 23 at ¶ 29; Doc. 28 at ¶ 29. Also on July 10, Griffith

6

testified that she told Toomey and McPeek that she had been previously diagnosed with post-traumatic stress disorder ("PTSD")[4] and was taking medication. Doc. 22-3 at 17.

On July 15, 2013, Tylor, who was in Pierre, South Dakota for training, also was put on administrative leave with pay following Griffith's allegations.[5] Doc. 25 at ¶ 6; Doc. 23 at ¶ 30; Doc. 28 at ¶ 30. The City sent Toomey to Pierre to take Tylor out of his training early and drive him back to Watertown. Doc. 25 at ¶ 6; Doc. 23 at ¶ 31; Doc. 28 at ¶ 31. Tylor was advised that any contact with Griffith would not be tolerated. Doc. 23 at ¶ 32; Doc. 28 at ¶ 32. After July 15, Tylor and Griffith were never in the Department at the same time again. Doc. 25 at ¶ 5; Doc. 23 at ¶ 33; Doc. 28 at ¶ 33. The DCI began its extensive investigation into Griffith's allegations against Tylor that same month. Doc. 25 at ¶ 2; Doc. 23 at ¶ 34; Doc. 28 at ¶ 34.

Codington County State's Attorney Dawn Elshere ("Attorney Elshere") was notified that Griffith had admitted to lying in the 2011 police investigation.[6] Doc. 24 at ¶ 4; Doc. 30-4 at 2; Doc. 30-9 at 1. Attorney Elshere determined that under Brady v. Maryland, 373 U.S. 83 (1963),[7] Griffith's untruthfulness must be revealed to defense counsel in each case Griffith was or would

---

[4] Griffith has disclosed no expert causation opinion indicating that the City caused her PTSD. Doc. 23 at ¶ 58; Doc. 28 at ¶ 58.

[5] McPeek testified that Tylor was originally placed on administrative paid leave because Griffith obtained a temporary protection order against Tylor. Doc. 30-1 at 6–7. That temporary protection order included certain provisions regarding Tylor's ability to possess a firearm. Doc. 30-1 at 6–7. Tylor's administrative leave changed to unpaid leave on July 31, 2013. Doc. 30-1 at 7.

[6] The City claims that it was not concerned about when Griffith lied or which statement was a lie; rather, the City was concerned that Griffith lied at one time or another and had admitted to lying. Doc. 22-4 at 10; Doc. 23 at ¶ 37. Griffith maintains, however, that Attorney Elshere based her Brady cop finding on Griffith's untruthfulness from the 2011 investigation. Doc. 28 at ¶ 37; Doc. 30-4 at 2–4; Doc. 30-9.

[7] Under Brady, the government must disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Impeachment evidence as well as exculpatory evidence falls within the Brady rule. United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 154 (1972).

7

be associated with and that prosecutors would experience difficulties prosecuting cases those cases. Doc. 23 at ¶ 40; Doc. 24 at ¶ 5; Doc. 28 at ¶ 40; Doc. 30-9 at 1. Attorney Elshere attested that she had a case at that time which involved Griffith as a necessary witness and that the case was pled down, stating that the "major reason" for doing so was because "Griffith . . . had [a] Brady issue." Doc. 24 at ¶ 6; Doc. 23 at ¶ 41; Doc. 28 at ¶ 41. After reviewing the information provided by the City, Attorney Elshere, although not asked by the City to make such a determination, decided that there were no Brady issues with Tylor. Doc. 24 at ¶ 5; Doc. 30-1 at 8; Doc. 30-4 at 4. Tylor never admitted to lying during any investigation, and McPeek testified that Tylor's version of the events surrounding the January 2011 incident has never changed. Doc. 22-4 at 10; Doc. 23 at ¶ 36; Doc. 28 at ¶ 36. Attorney Elshere later received the DCI investigation report and referred the matter to the Beadle County State's Attorney. Doc. 24 at ¶ 3; Doc. 30-4 at 2. The Beadle County State's Attorney reviewed the entirety of the report and opined that there was not enough evidence to charge Tylor with a criminal violation. Doc. 23 at ¶ 35; Doc. 28 at ¶ 35. After reviewing all the information after Griffith's 2013 allegations against Tylor, including the DCI report and the no-charge recommendation from the Beadle County State's Attorney, McPeek did not believe that he had cause to terminate Tylor or ask him to resign. Doc. 23 at ¶ 62; Doc. 25 at ¶ 7; Doc. 28 at ¶ 62. Tylor has not been charged with any crimes, and as of the filing of the motion for summary judgment, he remains employed as a police officer at the Department. Doc. 24 at ¶ 3; Doc. 25 at ¶ 7.

On the morning of July 24, 2014, McPeek and Toomey met with Griffith regarding her employment with the Department. Doc. 30-13. The meeting was audio recorded and lasted just under seventeen minutes. Doc. 30-13. McPeek and Toomey explained to Griffith how her untruthfulness in the 2011 investigation posed a Brady issue for prosecutors and that her

untruthfulness violated Department policy. Doc. 30-13 at 00:40, 4:50, 7:19, 10:50; see also Doc.

23 at ¶ 2; Doc. 28 at ¶ 2. Under the union contract governing Griffith's employment, dishonesty

provided grounds for termination. Doc. 23 at ¶ 2; Doc. 28 at ¶ 2.[8] Toomey and Griffith had the

following exchange:

> Toomy: We're not going to get past the credibility issues so that you can effectively testify in the future. . . . So we have some options for you. . . . So, we will give you the opportunity to resign, if you want.
>
> Griffith: No.
>
> Toomy: You're not going to resign your position?
>
> Griffith: No.
>
> Toomy: Okay. So you understand we are going to go through with a Loudermill[9] hearing?
>
> Griffith: Uh-huh.
>
> Toomy: And then we are—we are going for termination on you—
>
> Griffith: Okay.
>
> Toomy: —based on untruthfulness.
>
> Griffith: Yeah.
>
> Toomy: Are you sure that's the route you want to go?
>
> Griffith: I don't really have a choice.
>
> Toomy: Well, yes you do.
>
> Griffith: No, no.
>
> Toomy: You know that if you're terminated you will never work again.

---

[8] Griffith testified that as a union employee, she could only be terminated for just cause. Doc. 22-3 at 30.

[9] In Cleveland Board of Education v. Loudermill, the Supreme Court of the United States held that a public employee who holds a constitutionally protected interest in his job must be granted a hearing before being terminated. 470 U.S. 532, 542, 545–46 (1985).

Griffith: I'm never going to get hired back here anyway.

Toomy: Well, maybe not here but somewhere else.

Doc. 30-13 at 2:47–4:03.   Griffith was told that a <u>Loudermill</u> hearing would be public record. Doc. 30-13 at 6:45.  Both McPeek and Toomy repeatedly stated that Griffith had a "choice" or "options," Doc. 30-13 at 3:00, 3:47, 7:07, 8:00, 12:17, 13:07, 13:32, but throughout the interview Griffith stated she felt as if she had no options and no other choice but to resign, Doc. 30-13 at 3:45, 4:15, 12:15.  Towards the end of the conversation, Griffith eventually said, "I'll resign." Doc. 30-13 at 14:17.  Griffith was presented with a pre-drafted resignation letter that she could sign, but was also told that she could draft her own resignation letter, if she preferred.  Doc. 23 at ¶ 44; Doc. 28 at ¶ 44; Doc. 30-13 at 14:20.  Griffith signed the pre-drafted resignation letter. Doc. 23 at ¶ 45; Doc. 28 at ¶ 45; Doc. 30-13 at 15:20.  Griffith later testified that she was given the option to resign or go through the <u>Loudermill</u> termination hearing process and that she chose to resign.  Doc. 22-3 at 21.

In January 2014, Griffith filed a Charge of Discrimination with the South Dakota Division of Human Rights ("SDDHR") alleging sex discrimination against the City.  Doc. 1-1. The SDDHR issued its Determination of Probable Cause on February 10, 2014, Doc. 1-2, but because the City did not engage in conciliation, Doc. 1-7, Griffith was issued a Notice of Right to Sue Within 90 Days, Doc. 1-5.

The City provided evidence that in 2011, allegations of theft and dishonesty arose against a male officer employed by the City relating to improper reimbursement for travel checks.  Doc. 25 at ¶ 3; Doc. 23 at ¶ 46; Doc. 28 at ¶ 46.  That officer was suspended without pay, and the DCI conducted an investigation.  Doc. 25 at ¶ 3.  Following the DCI's investigation, Attorney Elshere

10

informed the Department that the officer had become a "Brady cop."[10] Doc. 24 at ¶ 7; Doc. 25 at ¶ 3; Doc. 23 at ¶ 47; Doc. 28 at ¶ 47. The male officer was told a Loudermill hearing for termination would be held, or he could resign. Doc. 23 at ¶ 48; Doc. 28 at ¶ 48. The male officer resigned. Doc. 23 at ¶ 49; Doc. 28 at ¶ 49.

## IV. DISCUSSION

### A. Title VII Claims

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against employees with respect to their "compensation, terms, conditions, or privileges of employment, because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer is also prohibited from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by" the provisions of Title VII. Id. § 2000e-3(a). Griffith and the City agree that Griffith's Title VII claims are evaluated under the framework pronounced by the Supreme Court of the United States in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[11] Docs. 21, 27, 33.

Under the burden-shifting framework set forth in McDonnell Douglas, in order to survive summary judgment the plaintiff must first demonstrate a prima facie case of discrimination. Macklin v. FMC Transp., Inc., 815 F.3d 425, 427–28 (8th Cir. 2016); Erenberg v. Methodist Hosp., 357 F.3d 787, 792–93 (8th Cir. 2004). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993); see also Jones v. City of

---

[10] Both parties refer to police officers who have been dishonest in some capacity as "Brady cops." Thus, for purposes of this Opinion and Order, this Court will use that term.

[11] Griffith does not argue, nor does the evidence present, direct evidence of discrimination. Doc. 27. Thus, to survive the City's motion for summary judgment, Griffith must establish discrimination through the McDonnell Douglas burden-shifting analysis. See DePriest v. Milligan, No. 15-1365, 2016 WL 3027254, at *3 (8th Cir. May 26, 2016).

St. Louis, No. 15-2283, 2016 WL 3201393, at *3 (8th Cir. June 9, 2016). If the defendant does so, the burden shifts back to the plaintiff to establish that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000) (quoting Tx. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981)); see also Macklin, 815 F.3d at 427. Despite the burden-shifting nature of the McDonnell Douglas framework, the ultimate burden of proving unlawful discrimination remains with the plaintiff. St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Tx. Dep't of Comm. Affairs, 450 U.S. at 252). Griffith's allegations that the City violated Title VII by discriminating against her based on her gender, creating a hostile work environment, and retaliation after the filing of a Charge of Discrimination are analyzed separately below.

### 1. Gender Discrimination

#### a. Prima Facie Gender Discrimination Claim

Griffith asserts a claim for gender discrimination under Title VII. In order to prove a prima facie claim of gender discrimination, "a plaintiff must show (1) [she] is a member of a protected class, (2) [she] met [her] employer's legitimate expectations,[12] (3) [she] suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination

---

[12] Griffith agrees that she must prove she met "the legitimate expectations of the employer." Doc. 27 at 3. But the City rightly pointed out in its reply brief that "[r]ecent Title VII law demonstrates some split in the Eighth Circuit as to whether or not . . . [Griffith] must show she was meeting [the] City's legitimate expectations or, instead, that she was simply qualified for her position at [the] City." Doc. 33 at 7; compare Macklin, 815 F.3d at 427 (stating the second prong as the "legitimate expectations" standard (quoting Young v. Builders Steel Co., 754 F.3d 573, 577 (8th Cir. 2014))), Smith v. URS Corp., 803 F.3d 964, 969 (8th Cir. 2015) (same), and Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 681 (8th Cir. 2012) (same), with DePriest, 2016 WL 3027254, *3 (noting the second element as "qualified for [his or her] job" (quoting Fiero v. CSG Sys., Inc., 759 F.3d 874, 878 (8th Cir. 2014))), and Fatemi v. White, 775 F.3d 1022, 1040 (8th Cir. 2015) (same). However, because Griffith cannot prove that the circumstances in this case give rise to an inference of discrimination, which is a necessary element of her prima facie gender discrimination claim, this Court need not determine whether Griffith met the City's legitimate expectations or was qualified for her job.

(for example, similarly situated employees outside the protected class were treated differently)." Macklin, 815 F.3d at 427 (quoting Young v. Builders Steel Co., 754 F.3d 573, 577 (8th Cir. 2014)). Neither party disputes that Griffith is a member of a protected class. Doc. 27 at 4; Doc 33 at 7; see also Doc. 21 at 19. Because Griffith cannot show that the circumstances give rise to an inference of discrimination, this Court does not need to discuss the second or third prongs of the Title VII claim.

Griffith cannot show that a similarly situated employee outside of her protected class was treated differently. "While '[t]he burden of establishing a prima facie case of disparate treatment is not onerous,' the plaintiff must be able to produce some evidence of similarity between her and her comparator." Rebouche v. Deere & Co., 786 F.3d 1083, 1087–88 (8th Cir. 2015) (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc)). Griffith makes two arguments to support an inference of discrimination: 1) that a similarly situated employee outside her protected class (Tylor, in Griffith's argument) was treated more fairly; and 2) that the City's explanation shifted over time. Doc. 27 at 6–8. Such assertions may create genuine issues of material fact on both inference of discrimination and pretext. See Young, 754 F.3d at 578; Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010). However, Tylor does not qualify as a "similarly situated employee" as a matter of law, and the City's explanation did not shift. Griffith attempts to show an inference of discrimination and pretext by characterizing the City's treatment of Tylor as comparator evidence. Doc. 27 at 9–10. For comparator evidence, Griffith must prove that she was "similarly situated [with Tylor] in all relevant respects." Young, 754 F.3d at 578 (quoting Chappell v. Bilco Co., 675 F.3d 1110, 1119 (8th Cir. 2012)); see also Bone v. G4S Youth Servs., 686 F.3d 948, 956 (8th Cir. 2012). The test to determine whether employees are similarly situated to warrant a comparison to the plaintiff is

a strict and rigorous one. Smith v. URS Corp., 803 F.3d 964, 970 (8th Cir. 2015); Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001) (quoting Harvey v. Anheuser–Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994)). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Bone, 686 F.3d at 956 (alteration in original) (quotation omitted).

Griffith argues that she is similarly situated to Tylor because they were both involved in lying during the 2011 investigation and each were disciplined in different ways; she was labeled a Brady cop and no longer works for the City while Tylor was placed on unpaid leave and later reinstated. Griffith maintains that because both she and Tylor denied the abuse allegations in the 2011 investigation and because she later admitted that her previous denial was a lie, Tylor also lied in the 2011 investigation. Doc. 27 at 7–8. The City counters that Tylor is not similarly situated with Griffith because all of the City's investigations and findings indicate that Tylor had not abused Griffith, and because Tylor never admitted to lying, he is not a Brady cop. Also, the City contends that the only similarly situated male to Griffith was treated in the same fashion as Griffith.

Griffith has failed to produce comparator evidence because she has not shown that Tylor was similarly situated to her in all relevant respects. Although Tylor participated in the same investigation that gave rise to Griffith's admission of untruthfulness, he was not "involved in or accused of the *same offense*." Hervey v. Cty. of Koochiching, 527 F.3d 711, 721 (8th Cir. 2008) (internal quotation marks and quotation omitted). Because Griffith has presented no evidence that Tylor admitted to lying in the 2011 investigation and because internal and external investigations did not conclude that Tylor had lied, mitigating differences preclude a definitive

14

finding that Tylor had been untruthful and is similarly situated to Griffith. See Bone, 686 F.3d at 956 (finding that employee was not similarly situated with other employees because there were mitigating differences between the two groups—employee was accused of resisting directives where other employees were not).

To argue shifting explanations, Griffith avers that the City changed it explanation for its employment decision from Attorney Elshere's Brady cop finding based on Griffith's untruthfulness in the 2011 investigation to being more general about when Griffith had lied. Doc. 27 at 7. The City's primary reason for asking Griffith to resign or undergo a Loudermill hearing has remained the same; the City has not shifted its explanation by expressing differently when the untruthfulness occurred. See Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014), cert. denied, 135 S. Ct. 1715 (2015); Elam v. Regions Fin. Corp., 601 F.3d 873, 881–82 (8th Cir. 2010). Griffith has thus failed to establish a prima facie case of gender discrimination because she is unable to show an inference of discrimination through either disparate treatment or a shifting explanation in her employment decision.

### b. Legitimate, Nondiscriminatory Reason

Even assuming arguendo that Griffith could establish a prima facie claim of gender discrimination, the City has shown that it had a legitimate, nondiscriminatory reason for the adverse action. The City's stated reasons for terminating Griffith—its determination that Griffith by admittedly lying to police had made herself a Brady cop—satisfies this standard because the City's burden is not an onerous one. See Bone, 686 F.3d at 954; see also Henry v. Hobbs, No. 15-1472, 2016 WL 3064567, at *3 (8th Cir. May 31, 2016) (finding employer showed a legitimate, nondiscriminatory reason for terminating employee where employer stated that it terminated employee based on determination that employee violated policy by making false

statements and improperly allowed inmate into restricted area); Johnson v. Ready Mixed
Concrete Co., 424 F.3d 806, 811 (8th Cir. 2005) ("If the employer was motivated by a good faith
belief that [the employee] was dishonest, then it was not motivated by [the employee's] race,
even if the conclusion about timing [of the employee's conduct] was erroneous."). Hence, the
burden would shift back to Griffith to show that the legitimate reasons offered by the City "were
not its true reasons, but were a pretext for discrimination." Reeves, 530 U.S. at 143 (quoting Tx.
Dep't of Comm. Affairs, 450 U.S. at 253).

### c. Pretext

To demonstrate pretext, Griffith "must both discredit the employer's articulated reason
and demonstrate the 'circumstances permit a reasonable inference of discriminatory animus.'"
Securitas Sec. Servs. USA, Inc., 769 F.3d at 611 (quoting Gibson v. Am. Greetings Corp., 670
F.3d 844, 856 (8th Cir. 2012)). More substantial evidence of discrimination is required to prove
pretext at this stage, as compared to the minimal showing required to establish a prima facie
case, "because evidence of pretext is viewed in the light of [the employer's] legitimate, non-
discriminatory explanation." Jones v. UPS, Inc., 461 F.3d 982, 992 (8th Cir. 2006). "To
succeed at this stage of the McDonnell Douglas analysis, [an employee] must prove that the
prohibited reason was a determinative factor in [the employer's] decision to terminate."[13] Id.
The Eighth Circuit has stressed that federal courts are not to act as "super-personnel departments
reviewing the wisdom or fairness of the business judgments made by employers, except to the
extent that those judgments involve intentional discrimination." Cronquist, 237 F.3d at 928

---

[13] Griffith also may show pretext "by showing that an employer . . . treated similarly-situated
employees in a disparate manner[] or . . . shifted its explanation of the employment decision."
Lake, 596 F.3d at 874. For the reasons discussed above, Tylor was not a similarly situated
employee and his treatment does not demonstrate pretext, and there was no shifting explanation
by the City of reasons for the adverse employment action.

(quoting Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995)).   "[E]mployers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices." Hervey, 527 F.3d at 720 (quoting Edmund v. MidAmerican Energy Co., 299 F.3d 679, 685–86 (8th Cir. 2002)).

Griffith has not produced evidence that the City's actions taken against her were based on her sex, rather than on an effort to resolve a personal conflict between divorcing employees or in an effort to manage the performance duties required by Department policy, including the need for officers to be able to testify without impeachment concerns. See Henry, 2016 WL 3064567, at *3–4 (finding that employee did not meet his pretext burden partly because employee introduced no evidence that proffered similarly situated employee also made false statements or was required to take the same truthfulness test); Ready Mixed Concrete Co., 424 F.3d at 810–11 (holding plaintiff was not similarly situated to coworkers when he "identifie[d] no evidence" that the employer believed the coworkers engaged in similar misconduct); Cronquist, 237 F.3d at 928 (granting summary judgment for defendant because plaintiff did not point to another employee who "engaged in conduct that was of 'comparable seriousness'" to plaintiff's).   Conversely, as noted above, the City has presented evidence of a similarly situated male employee who was also asked to resign or told a Loudermill hearing for termination would occur. See Henry, 2016 WL 3064567, at *3–4 (finding plaintiff did not meet his pretext burden partly because the employer provided evidence that a similarly situated Caucasian employee was fired for the same reasons as plaintiff); Rebouche, 786 F.3d at 1087–88 (affirming district court's finding that female plaintiff failed to establish a prima facie case of sex discrimination where she could not show similarity with another male employee, and several other men who were similarly situated with her remained in same employment grade).

17

The record, when viewed in the light most favorable to Griffith, does not raise a disputed issue of material fact to demonstrate that the City's legitimate, nondiscriminatory reason for Griffith's termination was a pretext for discrimination. Accordingly, the City is entitled to summary judgment on Griffith's gender discrimination claim.

### 2. Hostile Work Environment

The Supreme Court has held that Title VII is also violated when an employee is subjected to a hostile work environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). To establish a prima facie claim of a hostile work environment, a plaintiff must prove: "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take appropriate remedial action." Nichols v. Tri-Nat'l Logistics, Inc., 809 F.3d 981, 985 (8th Cir. 2016); see also Anda v. Wickes Furniture Co., 517 F.3d 526, 531–32 (8th Cir. 2008) (quoting Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 550 (8th Cir. 2007)). Griffith has failed to establish a prima facie case on her hostile work environment claim because she has failed to prove that any harassment was based on her sex and that any harassment affected a term, condition, or privilege of her employment.

"Whether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 965 (8th Cir. 1999). A plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998) (alteration in

18

original). Even if it were assumed that Griffith was subjected to an objectively hostile work environment, the City did not treat Griffith differently based on her sex. See Hervey, 527 F.3d at 721–22 (reciting a list of actions that supervisors took against employee, including criticisms, yelling, and requiring daily reporting, and then alleging that those actions were "taken because [the employee] is a woman . . . is insufficient evidence to support an inference of discrimination"). In fact, as noted above, the City introduced evidence where it had previously treated a male Brady cop in the same manner as Griffith. See Henry, 2016 WL 3064567, at *3–4; Rebouche, 786 F.3d at 1087–88.

In order for harassment to affect a term, condition, or privilege of employment, the "harassment must be both objectively and subjectively offensive, such that a reasonable person would consider it to be hostile or abusive, and courts make this determination by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Erenberg, 357 F.3d at 792 (internal quotation marks and quotation omitted); see also LeGrand v. Area Res. for Cmty. & Human Servs., 394 F.3d 1098, 1102 (8th Cir. 2005) (quoting Harris, 510 U.S. at 23). Griffith believes her workplace became intolerable because Tylor was present at some of her briefings, he would stand outside of the locker room when she got to work, and after seeking help from Toomey, she was given an ultimatum of resigning or undergoing a Loudermill hearing. Doc. 22-3 at 27–28; Doc. 30-7 at 6–7. Griffith testified that Tylor did not say anything directly to Griffith during those briefings; rather, he made general comments to others. Doc. 22-3 at 27–28; Doc. 23 at ¶¶ 52–53; Doc. 28 at ¶¶ 52–53. Griffith was upset by having to hear his voice, seeing him

19

stare at her during briefings, and seeing him in general. Doc. 22-3 at 28; Doc. 23 at ¶ 54; Doc. 28 at ¶ 54.

Under the totality of the circumstances, Griffith's allegations, even when the facts are viewed in a light most favorable to her, do not amount to conduct that is so severe or pervasive or indicate that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult." Sutherland v. Mo. Dep't of Corrs., 580 F.3d 748, 751 (8th Cir. 2009) (quoting Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002)); see also Al-Zubaidy v. TEK Indus., 406 F.3d 1030, 1038 (8th Cir. 2005) (stating that Title VII is not a "general civility code" (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998))). In this circuit, many hostile work environment claims have been rejected despite facts much more egregious than what Griffith has presented here. See, e.g., Alvarez v. Des Moines Bolt Supply, 626 F.3d 410, 420 (8th Cir. 2010) (finding sexually oriented remarks by female employee's co-workers did not create a hostile environment where comments about female employee's breasts were made on several occasions and where one co-worker told female employee that he was fixing a table so she could "strip dance on it"); LeGrand, 394 F.3d at 1100–03 (no hostile work environment created by defendant's unwelcome sexual advances on three separate occasions over a nine-month period, including asking the employee to watch pornographic movies with him, hugging and kissing, grabbing the employee's buttocks, and "brushing" of the employee's genitals with the back of defendant's hand); Tuggle v. Mangan, 348 F.3d 714, 716–18, 722 (8th Cir. 2003) (no hostile work environment based on defendant's inappropriate sexual and physical comments, taking a photograph of plaintiff's rear end, and giving plaintiff undesirable work assignments). Moreover, after the October 2012 incident with Tylor, Griffith was assigned to a new unit, and there is nothing in the record that indicates that Griffith's work performance declined. See

Johnson v. Gateway, Inc., No. CIV. 04-4186-KES, 2007 WL 1231657, at *6 (D.S.D. Apr. 24, 2007) (finding that harassment did not affect a term, condition, or privilege of plaintiff's employment where "alleged behavior had a minimal effect on [the employee's] work performance" and because employee continued to capably perform job duties until dismissed). Because no reasonable juror could find, even when viewing the facts in the light most favorable to Griffith, that Griffith was subject to a hostile work environment, the City is entitled to summary judgement on this claim as well.

### 3. Retaliation

Next, Griffith alleges that she was retaliated against when she filed a Charge of Discrimination with the SDDHR because the City thereafter "regularly ask[ed] . . . her to lift the restraining order" she had against Tylor and "refused to engage in conciliation." Doc. 1 at ¶¶ 56, 58–59. The City argues that Griffith failed to administratively exhaust the retaliation claim.[14] Griffith did not address the City's arguments on the retaliation claim in her briefing.

Before bringing suit, Title VII plaintiffs must timely file a charge with the Equal Employment Opportunities Commission ("EEOC") or state or local agency. 42 U.S.C. § 2000e-5(e)(1); see also Hutton v. Maynard, 812 F.3d 679, 683 (8th Cir. 2016); Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 989 (8th Cir. 2011). Section 2000e-5(e)(1) provides that the charge must include "the date, place and circumstances of the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Richter v. Advance Auto Parts, Inc., 686 F.3d 847, 850–51 (8th Cir. 2012) (per curiam) (quoting Nat'l

---

[14] The City preserved this affirmative defense in its Answer. Doc. 7 at ¶¶ 25, 27.

R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110–11 (2002)); see also Jones, 2016 WL 3201393, at *4.

In her SDDHR Charge of Discrimination, Griffith checked the box for "sex" as her basis for discrimination, but did not check the box for "retaliation." Doc. 1-1 at 1. Additionally, the narrative portion of Griffith's charge asserted that her claim was for "discriminat[ion] . . . on the basis of [her] sex" only. Doc. 1-1 at 1. Because Griffith did not make a retaliation claim in her administrative charge, summary judgment for the City is warranted based on Griffith's failure to exhaust her administrative remedies on the retaliation claim before bring this suit. Richter, 686 F.3d at 849–51 (affirming dismissal of retaliation claim for failure to exhaust administrative remedies because plaintiff's EEOC charge alleged adverse employment action based on sex and race but civil complaint alleged different "discrete act" of retaliation); Brooks v. Midwest Heart Grp., 655 F.3d 796, 801 (8th Cir. 2011) (finding employee failed to exhaust remedies with the EEOC with regard to her claims of age discrimination and retaliation because EEOC charge only mentioned discrimination on the basis of race and sex, and the boxes for age and retaliation discrimination remained unchecked); Tyler, 628 F.3d at 989–90 (holding that plaintiff who filed an EEOC charge alleging retaliation did not exhaust his administrative remedies for gender discrimination claim where EEOC charge left sex discrimination box unchecked, only alleged retaliation, and never mentioned gender); see also Sellers v. Deere & Co., 791 F.3d 938, 943 (8th Cir. 2015) ("Although we have often stated that we will liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo,* a claim which simply was not made." (internal quotation marks and quotation omitted)).

**B. Infliction of Emotional Distress Claims**

22

Griffith next alleges a claim of intentional infliction of emotional distress which, under South Dakota law, requires that she prove four elements: "(1) extreme and outrageous conduct by the defendant; (2) the defendant intended to cause severe emotional distress; (3) defendant's conduct was the cause in-fact of plaintiff's severe emotional distress; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct." Paulsen v. Ability Ins., 906 F. Supp. 2d 909, 916 (D.S.D. 2012) (quoting Tibke v. McDougall, 479 N.W.2d 898, 906 (S.D. 1992)). An intentional infliction of emotional distress claim in South Dakota "also includes reckless conduct resulting in emotional distress," meaning that a defendant "acted in a manner which would create an unreasonable risk of harm to him, and that [defendant] knew or had reason to know of facts which would lead a reasonable man to realize that such actions would create the harm that occurred." Moysis v. DTG Datanet, 278 F.3d 819, 827 (8th Cir. 2002) (alternation in original) (quotations omitted). "Proof under this tort must exceed a rigorous benchmark." Harris v. Jefferson Partners, 2002 SD 132, ¶ 11, 653 N.W.2d 496, 500.

For a defendant's conduct to be classified as extreme and outrageous, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Fix v. First State Bank of Roscoe, 2011 SD 80, ¶ 20, 807 N.W.2d 612, 618 (quoting Harris, ¶ 11, 653 N.W.2d at 500). "Liability for this tort will 'not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.'" Id. (quoting Harris, ¶ 11, 653 N.W.2d at 500); see also Restatement (Second) of Torts § 46 cmt. d. "[W]hether the defendant's conduct was extreme and outrageous is initially for the trial court," Fix, ¶ 20, 807 N.W.2d at 618 (quoting Harris, ¶ 11, 653 N.W.2d at 500), and "[o]nly '[w]here reasonable men may differ, [is it] for the jury . . . to determine whether, in the particular case, the conduct has been sufficiently extreme

and outrageous to result in liability.'" Dunn v. Lyman Sch. Dist. 42-1, 35 F. Supp. 3d 1068, 1092 (D.S.D. 2014) (second alteration in original) (quoting Richardson v. E. River Elec. Power Coop., 531 N.W.2d 23, 27 (S.D. 1995)).

The City contends that its actions were not extreme and outrageous, that it did not intend to cause Griffith's emotional distress, and that Griffith cannot prove that its conduct was the cause-in-fact of her emotional distress. Doc. 21 at 30–33. Griffith has not addressed any of those contentions. Her complaint, however, alleges that the City's "extreme and outrageous conduct arises from Tylor's abuse and by [the City's] insufficient efforts to curb [that] abuse and by [the City] predicating [Griffith's] termination on her failure to fully report said abuse. Such conduct gave said employees actual or apparent power to cause damage to [Griffith's] interest." Doc. 1 at ¶ 63.

Even when taking the evidence in a light most favorable to Griffith, the City's actions do not constitute extreme and outrageous conduct to give rise to a viable claim of intentional infliction of emotional distress under South Dakota law. The DCI and the City investigated Rau's report of a possible domestic dispute between Griffith and Tylor in January of 2011, and Griffith had a counseling session with a female police chief regarding the incident. Then, following Griffith's 911 call in October of 2012, and over Griffith's refusal to separate shifts from Tylor, the City moved Tylor to a different work shift in an effort to pre-emptively head off any future issues that could arise between the couple in the months leading up to their ultimate divorce in November 2013. When Griffith met with Toomey on July 8, 2013 and admitted that she lied during the 2011 investigation and reported that Tylor had physically abused her, both Toomey and Griffith agreed that she should go home for the day. When she returned two days later, the City placed Griffith on administrative leave with pay. That same week, Tylor was

24

taken out of training early and placed on administrative leave. Tylor was told that contact with Griffith would not be tolerated, the two were never at the Department at the same time after that date, and the City conducted an investigation of Tylor that month. Although the record is not entirely clear as to when or whether Griffith returned to work following her paid administrative leave and when the briefings at which Tylor and Griffith were both present occurred, Tylor's presence near the vicinity of Griffith's locker room and comments made at briefing meetings— not directed towards Griffith—do not rise to the level of extreme and outrageous actual conduct by the City. See Richardson, 531 N.W.2d at 29 n.2 (noting that "[n]either [the former employee's] employment history, nor [the supervisor's] thoughts or intent (the second element of an intentional infliction of emotional distress claim), factor into an examination of the *actual conduct* which must be extreme and outrageous"); see also 82 C.J.S. Torts § 75 (West 2016) (noting that an intentional infliction of emotional distress claim "is not established against an employer where the distress was largely caused by alleged [] harassment at the hands of fellow employee and not attributable to the employer"). Additionally, during the meeting on July 24, 2013 that led to Griffith's resignation, Toomey and McPeek did not use profanity, did not insult Griffith, and did not raise their voices; rather, they explained how Griffith's untruthfulness in the 2011 investigation posed a Brady issue for prosecutors and that her untruthfulness was a violation of Department policy, creating grounds for termination under her union contract. See Dunn, 35 F. Supp. 3d at 1092–93 (granting summary judgment for employer on intentional infliction of emotional distress claim because school district superintendent's conduct of informing an employee that his contract might not be renewed, the replacement of employee by a younger employee who was related to a school board member, and superintendent's response to employee's EEOC charge, even when taken together, did not amount to outrageous conduct);

Esser v. Tex. Roadhouse Mgmt. Corp., No. Civ. 08-4004-KES, 2010 WL 396224, at \*5 (D.S.D. Jan. 27, 2010) (finding employer's conduct was not extreme and outrageous where employee was terminated for reporting that her manager had sexually harassed other coworkers because employee was terminated in private setting, free of shouting, profanity, or other similar behavior); Richardson, 531 N.W.2d at 25–29 (affirming trial court's grant of summary judgment for employer where former employee was an at-will employee who could be discharged without cause and where civilized meeting was conducted—no voices raised or profanity used—to explain employee's options). Although the City became aware that Griffith had been previously diagnosed with PTSD on July 10, 2013, the City's actual conduct after that date, even when viewed in a light most favorable to Griffith, was not uncivilized. See Richardson, 531 N.W.2d at 29 n.2.

Given the undisputed facts of this case, the City's actual conduct does not rise to the level of extreme and outrageous conduct that can be characterized as so extreme in degree as to go beyond all possible and tolerable bounds of decency. Because Griffith failed to meet her burden on the elements of the intentional infliction of emotional distress claim, the City is entitled to summary judgment on this claim.

Finally, Griffith asserted a negligent infliction of emotional distress claim against the City. "To prove this claim, a plaintiff must prove (1) negligent conduct on the part of the defendant, (2) emotional distress suffered by the plaintiff, and (3) physical manifestation suffered by the plaintiff from the distress." Reynolds v. Ethicon Endo-Surgery, Inc., 454 F.3d 868, 874 (8th Cir. 2006) (citing Nelson v. WEB Water Dev. Ass'n, 507 N.W.2d 691, 699 (S.D. 1993)). Griffith did not respond to the City's motion for summary judgment on this claim. Nor do the

undisputed facts support such a claim. Thus, summary judgment is justified for the City on the negligent infliction of emotional distress claim as well.

## V. CONCLUSION

If Tylor assaulted Griffith, this result of Griffith no longer being a police officer and Tylor continuing as one is unjust. However, on this motion for summary judgment, this Court is not deciding whether Tylor assaulted Griffith or whether Griffith should be the one to remain a police officer. This Court, instead, must apply the law to the facts taken in a light most favorable to Griffith. Her denial during the investigation that Tylor had ever hit or pushed her and her subsequent statement that she lied during that investigation prompted the City to undertake the actions Griffith now claims to violate Title VII and state law.

For the reasons stated above and for good cause, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, Doc. 18, is granted.

DATED this  12ᵗʰ day of August, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

27